# **EXHIBITS**



**CULTURE OF SILENCE**

# Inside the alleged abuse of at-risk youth in Pa. treatment centers

An investigation by the USA TODAY Network uncovered stories of abuse of mentally ill juveniles at state-run centers.

**Carley Bonk** Chambersburg Public Opinion

Published 10:00 PM EDT Apr. 29, 2020 | Updated 9:25 AM EDT Apr. 30, 2020

O ne former resident at the juvenile detention center said a staff member kneed him in the back so hard that he couldn't get out of bed.

Another said his jaw was so damaged in a physical restraint that he required surgery to fix it.

Three former employees of the Franklin County South Mountain Secure Treatment Unit said in separate interviews that staff repeatedly abused children while physically restraining

Claude Rhodes said he remains deeply traumatized by his time working at South Mountain.

"In my dreams, I'm replaced with the kids," he said. "I'm the one being abused."

Advertisement

3/25/22, 2:40 PM
Case 2:22-cv-00499-DSC Document 1-1 Filed 03/28/22 Page 4 of 49
Pennsylvania youth treatment centers have been accused of abusing kids

These new allegations uncovered in a six-month investigation by the Chambersburg Public Opinion mirror claims made in a lawsuit filed last April alleging mistreatment of juveniles under the care of the Pennsylvania Department of Human Services at South Mountain Secure Treatment Unit, Loysville Youth Development Center and North Central Secure Treatment Unit in Danville.

The civil lawsuit describes staff abusing, intimidating and failing to adequately de-escalate situations involving children with mental and behavioral problems in the state's care between 2017-2018.

The suit specifically focuses on the unlawful use of physical restraints on residents, as well as punching, hitting, kicking and choking youth. The lawsuit also alleges residents at all three facilities have sustained injuries from restraints, such as cuts, bruises, sprains and black eyes.

Disability Rights Pennsylvania v. Pennsylvania Department of Human Services by Carley Bonk on Scribd

3/25/22, 2:40 PM
Pennsylvania youth treatment centers have been accused of abusing kids
Case 2:22-cv-00499-BSC   Document 1-1   Filed 03/28/22   Page 5 of 49

According to the Pennsylvania code, a <u>manual restraint</u> is "a physical hands-on technique that lasts more than 1 minute, that restricts the movement or function of a child or portion of a child's body."

Alongside physical abuse, staff have intimidated youth at these facilities on a regular basis, according to the lawsuit, and children with disabilities have been referred to by derogatory names such as "dogs," "f- dummies" and "stupid people."

The suit against South Mountain was brought by <u>Disability Rights Pennsylvania</u>, an independent, statewide, nonprofit corporation designated as the federally mandated protection and advocacy agency in Pennsylvania. Representatives from Disability Rights PA declined to comment for this story because of pending litigation.

3/25/22, 2:40 PM
Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 6 of 49
Pennsylvania youth treatment centers have been accused of abusing kids

☰ **Public Opinion**

<u>Subscribe</u>    Sign In

DHS officials say that all allegations are taken "extremely seriously."

"The safety of both youth and staff are our primary responsibility and priority," DHS spokeswoman Erin James wrote in an email.

The Public Opinion reached out to DHS, a South Mountain director and a South Mountain supervisor to address specific claims of misconduct and abuse shared in this story by former South Mountain residents and staff members, but all declined to comment.

The 125-page complaint recounts the stories of 11 unidentified youths who said they were abused in the three state-run treatment centers.

These three facilities say they provide "state-of-the-art treatment, care and custody services to Pennsylvania's most at-risk youth," according to the lawsuit.

But allegations of abuse in the lawsuit and those shared with the Public Opinion by former residents and employees who are not involved in the lawsuit raise questions about the quality of care provided in these state facilities.

South Mountain has 36 beds and is designed to hold and treat serious and habitual juvenile offenders, males age 15 to 21, many with diagnosed mental illnesses. In the fiscal year 2017-2018, 67 youths were placed at the South Mountain facility, according to the complaint.

Handbooks provided to residents at all three of these facilities tell youths they have the right to "receive rehabilitation and treatment, be treated with fairness, dignity and respect and not to be abused, mistreated, threatened, harassed, or subjected to corporal punishment."



(PHOTO: ILLUSTRATION BY EMILY NIZZI/USA TODAY NETWORK)

Case 2:22-cv-00499-BSC   Document 1-1   Filed 03/28/22   Page 7 of 49

sharing the abuse he says he suffered now because he doesn't want other kids to experience what he said he went through. Vlair is not a party to the lawsuit.

"This was supposed to be treatment, not jail," the Philadelphia man said.

From the very beginning, Vlair said, he noticed abuse by staff.

"They would punch you and kick you," he said. "There was a lot of chaos."

Vlair alleges that his jaw was "popped out of the socket" when a member of the staff restrained him. He said he filed multiple complaints but never heard anything back.

Zacarias Muth, now 20, of Reading, who is not a party to the lawsuit, said he was put in a restraint in his first week at the facility until he became unconscious.

"I had to sit in bed for a while because my back was messed up," he said. "Staff had put his knee in my back so hard that I couldn't move — it hurt too bad."

Unable to move, Muth said, Tylenol was the only medical assistance he was offered.

Muth said he was restrained because he didn't want to come out of his room.

Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 8 of 49

He filed a complaint with ChildLine, the statewide child protective services program in place to investigate suspected child abuse, he said.

"(State investigators) said the complaint was unfounded and nothing was reported out of the ordinary," he said.

Between 2017 and 2018, all of the 18 reports to ChildLine regarding abuse at South Mountain were considered "unfounded" by the Department of Human Services, according to the department.

The Public Opinion attempted to obtain ChildLine reports and related documents from DHS, but the Right to Know request was denied on grounds of Child Protective Services Law confidentiality, juvenile records exemption and noncriminal investigation exemptions under Pennsylvania law.

Muth said he became estranged from his family at the age of 17. In his time at South Mountain, he said, he had no contact with anyone on the outside.



The South Mountain Secure Treatment Center stands on the grounds of the South Mountain
Restoration Center in Franklin County, Pennsylvania. A lawsuit, former employees and residents
allege abuse of high risk youth behind the barbed wire fence.

CARLEY BONK / CHAMBERSBURG PUBLIC OPINION

## Restrain 'only when necessary'

In one of the events described in the suit, a staff member punched a resident in the face while
restraining him, breaking the young man's medial orbital wall around his left eye and
knocking him unconscious, according to the lawsuit.

"Youth No. 9" has been diagnosed with an array of disabilities, including bipolar disorder,
intermittent explosive disorder and oppositional defiant disorder, according to the
complaint.

A Youth Development Center nurse reported a number of injuries that resulted from the
restraint on Oct. 16, 2018, including bruising, bleeding, facial fracture, slurred speech and
dizziness, according to the complaint.

Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 10 of 49

☰  **Public Opinion**                    Subscribe    Sign In

---

said no one spoke to him to investigate the complaint.

He was returned to the same facility under the care of staff members who were responsible for injuries that had put him into the hospital in the first place, according to the complaint filed in the Disability Rights Pennsylvania lawsuit.

The complaint states, "Youth No. 9 suffered physical injury, pain, suffering, humiliation, embarrassment and emotional harm that persists to this day due to his experience at South Mountain."

Under Pennsylvania law, staff members are allowed to physically restrain youth "only when necessary to protect the patient/resident from injuring himself or others, or to promote normal body positioning and physical functioning."

Additionally, the law states that staffers at Youth Development Centers are prohibited from using restraints "as punishment, or for the convenience of staff, as a substitute for the program, or in any way that interferes with the treatment program."

The lawsuit alleges multiple cases in which residents were injured by staff members' persistent use of physical restraints.

"All uses of restraints are reviewed by management to determine the necessity and if the restraint occurred within the scope of Safe Crisis Management training," James wrote in an email.

"Restraints that are not necessary or are outside the scope of training are investigated and called into ChildLine if they meet the criteria of suspected child abuse and are also sent to the Pennsylvania State Police (PSP) and investigated by the department's Office of Administration for the purpose of determining appropriate staff disciplinary action," she wrote.

Despite clear language that restraints are to be used as a last resort, some former employees say they were nearly a daily occurrence at South Mountain. The lawsuit additionally states "illegal and violent physical restraints" were routinely used.

Juvenile Justice Placement" asserts that youth placement can be harmful.

"In a national survey of over 7,000 youth in juvenile facilities, an unacceptably high rate of youth (29%) reported 'being beaten up or threatened with being beaten up since coming to their facility,'" the report concludes. "Nearly one quarter (24%) of victims said their assailants were facility staff."



Rhodes said a staff member responded by smacking a teen out of his chair.

(PHOTO: ILLUSTRATION BY EMILY NIZZI/USA TODAY NETWORK)

## Former employees speak out

The abuse Claude Rhodes said he witnessed during his year of employment at South Mountain gives him nightmares to this day.

The 59-year-old Chambersburg man took the job at South Mountain because he wanted to help kids. He said it didn't take long until he would hear them crying out for help.

On his first day on the job, one teen asked for a spoon, because he liked to crumble his cookies up in his milk to eat it like cereal. Rhodes said a staff member responded by smacking him out of his chair.

"He started calling my name — 'Mr. Rhodes, Mr. Rhodes,'" he said. "It's messed up. And they know, when I seen it happened, I stopped them in front of everybody."

Rhodes broke into tears as he remembered the children he tried to help behind the barbed-wire fence. "I didn't even know this did this to me until I started talking about it," he said.



### Ex-South Mountain staff on a 'culture of fear' inside

"We say we are a treatment facility. False. Absolutely false."

CHAMBERSBURG PUBLIC OPINION

Another staffer, Herman Alston, 58, of St. Thomas, said in a separate interview that one child in the mental disabilities unit was placed in solitary confinement for days. He said the child began drawing pictures with his feces as Alston pleaded for staff to stop putting these residents on lockdown.

"I told them I just came from a training and they said this isn't good," Alston said. "Y'all think that's making him better — by not letting him out, 24 hours a day, making him stay in that room, talking to nobody? It's just making them worse."

Additionally, the lawsuit alleges injured youth at North Central and Loysville were repeatedly placed in "exclusion" after "illegal restraint" methods were deployed by staff, for "hours or days" at a time.

Alston's allegation was corroborated by two other employees who worked at the facility at the time.

☰   **Public Opinion**                    <u>Subscribe</u>     Sign In



(PHOTO: ILLUSTRATION BY EMILY NIZZI/USA TODAY NETWORK)

## Mistreatment of residents and workers

Kelley Covert, 42, of Chambersburg, worked at South Mountain from May 2015 to September 2016. After working in a similar job at the privately owned Abraxas Youth Center across the street for almost a year, Covert decided to apply at South Mountain for better job benefits through the state.

"My purpose was to help the kids, to be there for the kids," she said. "That's why I got into this field. That's what I went to school for — to help kids, help people in general."

Covert has a master's degree in criminal justice. She also has worked as an adult mental health caseworker for almost 10 years, regularly dealing with individuals suffering from schizophrenia, major depression, bipolar disorder and more.

Covert said she always tried to put herself in her client's shoes.

"Each kid has their own story," she said. "Most likely, 99.9% of them came from an abusive situation. They're trauma survivors themselves, they grew up with horrific conditions."

But the job at South Mountain was nothing like she expected.

Advertisement

Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 15 of 49

☰ **Public Opinion**                    <u>Subscribe</u>   Sign In

"One of the main things would be the horrific way they treated the kids," she said. "They restrained kids for no reason. There was a kid sitting at a desk, and he wasn't sitting up straight enough, and they said, 'You go restrain him,' and I said, 'No, I'm not restraining him, there's no reason to restrain him.' I went to the week-long training, the orientation. I knew that that was not how you're supposed to do your job."

Covert said refusing to restrain a resident led to her being "written up," a common punishment for workers who refused to follow orders. If an employee is written up frequently, he or she runs the risk of termination.

Repeated attempts to report abuse went nowhere, she said.

"There was nothing I could do," Covert said.

She didn't feel that management cared about the staff either.

"There was a client that, during that shift, he threatened to rape me multiple times, just saying horrific things to me," she said.

After multiple attempts to report the threats to upper management, nothing was done, according to Covert.

"This is exactly what they said to me, because I'll never forget it, 'don't be a baby and just grow up,'" she said.

Covert left early that night and said she ended up going to the hospital a few hours later for anxiety stemming from the incident.

"I did sign out, but it was a job abandonment, they said," Covert explained. "They found out I hired a lawyer, and boy, did I have my job back real quick, no issues."



(PHOTO: ILLUSTRATION BY EMILY NIZZI/USA TODAY NETWORK)

## Urged to falsify reports

Alston said he's filed well over 100 complaints in the eight years he worked at the facility about the aggressive handling of residents, but he claims they've gone nowhere.

Staff members, he said, were often told to rewrite their witness statements to obscure what actually happened in restraints.

Want to know more about what's going on in your community? **Subscribe today.**



"They beat this kid up, bloodied him up, knocked him out and dragged him into the room," Alston said. "When we tried to get on the internet report they had taken it off of the computer so you couldn't read it — the information is unavailable. You couldn't even see it or view (a video of the incident) on the camera. I don't know what they were doing."

"You can't write in your words what happened," Rhodes said. "You have to get with somebody else that tells you how to write it. They don't want anybody looking into it once it gets into the system."

Covert said an injury she suffered while working at South Mountain was covered up.

3/25/22, 2:40 PM
Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 18 of 49
Pennsylvania youth treatment centers have been accused of abusing kids

☰  **Public Opinion**                    Subscribe    Sign In

in an upper torso, and I was backing up against the wall. Staff from another unit came storming in, slammed both of us into the wall."

Covert had to fill out an incident report because she said her legs, back and wrists had been injured during the incident.

Again, she said she was told not to report it.

The former employees who spoke with the Public Opinion all said they had been ordered to falsify reports throughout the course of their employment.

Disability Rights of Pennsylvania also claims multiple incidences of "false and misleading reports" at all three facilities, "inconsistencies in written reports and video documentation" at South Mountain and a lack of meeting minutes required by the state at all three facilities between 2017-2018.



**How South Mountain staff withheld the truth of abuse**

A former South Mountain staff member describes how staff concealed details of abuse at the juvenile detention center.

NATE CHUTE, USA TODAY NETWORK

## ☰ Public Opinion                                        **Subscribe**    Sign In

Christopher Adams, 42, of Fayetteville, is a former youth counselor at South Mountain.
He said he suffered from severe PTSD from his time serving active duty in the military.

For the most part, he bonded with residents and enjoyed the job, according to Covert, Adams'
fiancée.

Adams took a leave of absence from his job after he attempted suicide. He was hospitalized
for five days and took a few weeks off.

Adams said he felt like he was being pushed out of the job. "Just mentally, physically, they
drained everything out of him and then took advantage of his mental health," she said. "When
he went back, he told me it was never the same. All of a sudden, he was doing this wrong, he
was getting written up for this."

"He has severe PTSD; he's a veteran," Covert said. "He has mental health issues, but he was
getting help. He was going to therapy, he was seeing a psychiatrist, he was on medications."

That's when Adams started speaking up about what he described as abuse of the residents –
some of which he said he participated in. Eventually, Adams said, he resigned in September
of last year.

**More:** Scout leader knows how to recognize, prevent abuse because he says he was nearly a
victim

Court records indicate that after Adams left South Mountain, he remained in touch with
those who worked there. A former South Mountain coworker was granted a protection-from-
abuse order against Adams after several instances of alleged vandalism were noted between
late September and early October 2019.

The PFA application also indicated that Adams and the coworker had been in a relationship
from January 2019 to May 2019.

On Nov. 8, 2019, Adams was arrested by Gettysburg Police for allegedly breaking into the
home of that coworker late that evening and shattering approximately 15 windows in the
residence, violating the PFA order. Adams allegedly told police he had consumed alcohol
before arriving there that night.

≡  **Public Opinion**                                    <u>Subscribe</u>    Sign In

reached out to the woman whose home was allegedly broken into, and she declined to comment.



(PHOTO: ILLUSTRATION BY EMILY NIZZI/USA TODAY NETWORK)

## A mother's concerns

Sylvia Prince, of New Jersey, struggled when her son, Vengie Hardmon, was placed at South Mountain after he was convicted on a rape charge at 17 years old. Hardmon continues to proclaim his innocence.

Prince said South Mountain changed her son — and not for the better.

"Even when my son came home, he's not the same child he was before he went in there," she said. "He has a lot of stresses in his life now. Mentally, he still has a battle within himself because the way he was treated in there."

Prince said Hardmon was an honor roll student, with confidence, motivation and a lot of friends. Since his time at South Mountain, Hardmon has lost weight and lost that motivation and confidence his mother was so proud of before.

"He's not the same kid that they took from me," she said.

"My son was gone for one year, four months, 12 days and 16 hours," she said. "Every night, I cried, I worried."



Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 21 of 49



## 'I don't see that same kid.' How abuse at South Mountain impacted a mother's son

On a visit to South Mountain, Sylvia Prince says she saw a bruise on her son's neck.

NATE CHUTE, USA TODAY NETWORK

She cried and worried because of incidents she would hear of from her son, such as the time he said he was choked by a counselor.

"When I went to see my son, he has bruises on his neck," she said. "My son didn't want to tell me what happened because he didn't want me to say anything."

Prince said she spoke with an official at the facility about her concerns. She said she was told to contact ChildLine if she thought her child was being mistreated.

"My son said to me, 'Mom, if I call that number or if you call that number, it's only going to make things worse for me,'" she said. "As a parent, my heart is hurting because I know that my child is being mistreated. I get emotional because I know that my child is being abused at the hands of people that are supposed to be an authority."

Covert confirmed Hardmon's concerns. "They couldn't report it," she said. "If these kids reported it, they would be physically beaten."

**Alabama prisons:** 'American horror story': The prison voices you don't hear from have the most to tell us

Prince's story of physical signs of abuse aligns with similar claims in the lawsuit. Following Youth No. 9's October incident of a broken orbital bone, another staff member at South Mountain taunted him, asking, "do you want to go for round two," according to the lawsuit.

Hardmon's mother said Adams apologized to her for how her son was treated during his time at South Mountain.

Adams told Prince he didn't want to "charge" her son but was told to do so.

"He said he just grabbed my son in a chokehold and my son became defensive and started punching him," Prince said. "He said he was trying to tell my son, 'calm down, calm down, calm down, I'm not going to hurt you.' But, of course, my son doesn't know this, you know, 'you're a worker, so I don't know if you're really for me or you're really against me.'"

Whenever she could, Prince would make the three-and-a-half-hour drive one way with as many of Hardmon's seven brothers and sisters that could go to visit him at the facility.

---

Help the Chambersburg Public Opinion continue to provide local investigations like this. **<u>Find our latest subscription options and special offers here.</u>**

---

One of those trips was just for the family to wave at Hardmon from the front gate. Without notice, Prince said, she was told she wasn't allowed to meet with her son because there wasn't anyone available to oversee the meeting, though she had made an appointment to see him.

"It was mentally taxing on myself and my family," Prince said. "We are a very close-knit family, and for my son to be in this predicament and to see him in that space, it was a lot on us."

Alston, Covert and Rhodes all agreed that staff would regularly egg on the kids, escalating situations to make them upset — sometimes by saying derogatory statements about the child's family.

"They would say things about the kid's mother or grandmother," Rhodes said. "Once they get them mad, they can do what they want to do to them."

≡ **Public Opinion**     **Subscribe**    **Sign In**

behavior or violence.

But it wasn't in their job description to carry out punishment, Alston said.

"We weren't the judge and jury," he said.

"Treat others like complete garbage — that's not why they're there," Covert said. "That's not why I was there, but not everyone was like me. They were doing what they were told to do, which is 'you restrain this kid, you punch this kid in the face, you take this kid to the angle where the cameras aren't shown.'"

Residents interviewed for this report said they were kept in the facility longer than they were originally supposed to be because staffers "altered stories to fit the narrative."

Vlair said he was told by the court he would reside at South Mountain for nine months. He spent two years behind the barbed-wire fence. Muth said he too was there longer than he was supposed to be.

Because minors are often represented through their case files to judges who decide how much time they should serve, most of them don't have the chance to tell their side of the story. When reports are made by staff of why a minor had to be put in a restraint, it can reflect badly on their progress and add time to their sentence, according to former residents and a parent.

"I missed out on a lot of stuff that can't be brought back," Muth said. "Like, for example, high school — I've never been to high school. I don't have many friends."

The lawsuit notes that staff at all three facilities have "extensive authority or power over youth" and have reported that counselors "assert they have the power to 'keep (youth) here longer.'"

## 66

### It's definitely run like a prison

**– Kelley Covert, 42, of Chambersburg**

former employees and residents continue to insist otherwise.

"It's a prison mentality," Alston said, reflecting on the way guards interact with residents.

Covert said she worried a resident would be seriously injured or killed at South Mountain.

"It's definitely run like a prison," she said. "I've been in and out of prisons for my previous job working in Cumberland County, when I was a forensic caseworker, so I've been in prisons. It was absolutely like a prison, even worse than a prison, to be honest."

"We try to teach them these different ways of how they're supposed to act and control their temper," Rhodes said. "We let them go after doing all this bad stuff to them and send them back to the streets and expect them to be law-abiding citizens. It's not going to happen."

**More:** <u>Once-respected Chambersburg gynecologist pleads guilty to taking photos of patient</u>

**More:** <u>Chambersburg man told girl he was a doctor and molested her for years, police say</u>

**More:** <u>Former Pa. scoutmaster, citizen of the year focus of inquiry into decades of sex abuse</u>

Published 10:00 PM EDT Apr. 29, 2020 | **Updated 9:25 AM EDT Apr. 30, 2020**

Advertisement

Help · Terms of Service · Your California Privacy Rights/Privacy Policy · Privacy Policy · Site Map · Accessibility · Our Ethical Principles · **Manage Cookies**

https://www.publicopiniononline.com/in-depth/news/local/2020/04/30/pennsylvania-youth-treatment-centers-have-been-accused-abusing-kids-south-...   23/24

3/25/22, 2:40 PM
Pennsylvania youth treatment centers have been accused of abusing kids
Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 25 of 49

Public Opinion    Subscribe    Sign In

© Copyright Gannett 2022

Please Sign In and use this article's on page print button to print this article.

HEALTH CARE

# Pittsburgh-based treatment center to eliminate 100-plus SA jobs



San Antonio is bracing for more layoffs.

GABE HERNANDEZ | SABJ

**IN THIS ARTICLE**

**Career & Workplace**
Industry

**Physician Practices**
Topic



By W. Scott Bailey
Senior Reporter, San Antonio Business Journal

Jul 23, 2020
**Updated** Jul 24, 2020, 12:02pm CDT

Abraxas Youth & Family Services plans a mass layoff at its San Antonio facility, which is at the Hector Garza Center on the city's Far North side.

The Pittsburgh-based company, which provides community-based and residential programming for at-risk youth, adults and families, has informed the Texas Workforce Commission that it expects to lay off approximately 140 employees by late September.

**RELATED:** Food service company to lay off hundreds as USAA extends work from home

According to its website, Abraxas provides specialized and intensive behavior modification as well as licensed chemical dependency services.

The company did not indicate what prompted the planned workforce reduction in San Antonio. It's also not immediately clear what Abraxas' plans are for the Alamo City operations.

Abraxas did note in a letter to the TWC that this action is expected to be permanent.

**RELATED CONTENT**

Food service company to lay off hundreds


Bankrupt oil company warns of San Antonio office closure


Boeing parts supplier shutters SA office


Call answered: Pandemic prompting greater demand for telehealth


SA craft breweries could close without state help


LATEST HEADLINES

# Delaware County officials seek solution for juvenile detention crisis



MEDIANEWS GROUP FILE PHOTO

The Delaware County Juvenile Detention Center in Lima.



Case 2:22-cv-00499-DSC    Document 1-1    Filed 03/28/22    Page 29 of 49

Members of Delaware County Council said it may be time to start recreating capacity herefor juvenile offenders, a year after the Juvenile Detention Center was closed and as youths are being released back into the community due to lack of space elsewhere.

In considering adding options for juvenile placements, county Councilwoman Christine Reuther said, "When you see something phrased as 'much needed,' it makes me realize that we're going to have to have a discussion … as to whether or not we seek to make sure that the license for the Juvenile Detention Center is renewed in that we create some capacity here in Delaware County for juveniles."

A year ago, Delaware County Common Pleas Court President Judge Kevin F. Kelly closed the 60-bed county Juvenile Detention Center in Lima after the facility lost its state license following allegations of physical, sexual and psychological abuse brought by Delaware County Public Defender Chris Welsh and First Assistant Public Defender Lee Awbrey.

Last month, Molly Stieber from the state Attorney General's Office declined to elaborate beyond confirming that the situation continues to be investigated.

"The Office of Attorney General accepted a criminal investigative referral into the Delaware County Juvenile Detention Facility and under the law we are not able to share any further details," she said.

In the meantime, Delaware County's housing situation with juveniles who have entered the adjudication system becomes more acute as time passes.

Since the center has closed, Delaware County has formed partnerships with Montgomery and Bucks counties, the ASPIRE Youth Center and Abraxas in Morgantown, Pa.

Earlier this month, county council unanimously approved a contract with Northampton County to expand options for male and female juvenile housing. As with all of the other contracts, except Abraxas, Northampton and the other providers reserve the right to deny Delaware County a bed for any reason ranging from lack of staffing to the juvenile's behavior.



In an attempt to get some housing stability, county council unanimously approved expanding a contract by $425.61 with Cornell Abraxas Group for pre-paid detention beds through June 30 to have a definitive place for youths. By pre-paying for beds, Delaware County has a guaranteed location for some of these youths.



The situation has been presenting challenges.

Last September was the first time Delaware County had to confine two youths accused of committing armed robberies to their homes as it ran out of options for juvenile detention placements.

Last month, three youths with charges ranging from burglary, robbery, terroristic threats, harassment and simple assault had to be released back into the community. Two of them had already been previously released into the community two and three times and officials reported that they immediately cut off their GPS monitors within minutes of being released from the police station.

County staff said law enforcement is frustrated with the process, especially as some of the youths now tell them to not even bother putting the GPS on.

Members of the Delaware County Juvenile Detention Board of Managers voiced their frustration as well as county officials spoke about their attempts to form a partnership with Chester County to help alleviate the need here.



3/25/22, 6:24 PM Delaware County officials look to have discussion to seek to have Juvenile Detention Center license renewed

Case 2:22-cv-00499-DSC Document 1-1 Filed 03/28/22 Page 31 of 49

Recently, a bench warrant was issued for 16-year-old Angelo "AJ" Ford of Sharon Hill, who escaped from the ASPIRE youth facility sometime the night of Feb. 24 or the early morning of Feb. 25. Ford is charged with attempted murder, aggravated assault and weapons offenses for allegedly shooting at Horace Strand, 18, in an exchange of gunfire shortly after the Aug. 27 Academy Park football game one block west of the football field. Police have identified Ford as associated with a gang.

Court documents stated that immediately after Ford and Strand fired their shots, the three uniformed officers discharged 25 rounds at a Chevy Impala making its way down Coates Street. Four people were struck by the gunfire, including 8-year-old Fanta Bility, who lost her life.

Former police officers Devon Smith, 34, Sean Patrick Dolan, 25, and Brian James Devaney, 41, have since been fired and face one count each of voluntary manslaughter and involuntary manslaughter and 10 counts each of reckless endangerment.

Regarding the juvenile detention center situation, Reuther said it  may be time for a discussion to start at the Juvenile Detention Board of Managers regarding having some kind of housing capacity here in Delaware County.

"There doesn't seem to appear to be a whole lot of capacity out there for offenders where there is a strong feeling that they need to be securely detained for some period of time," she said.



# Kathleen E. Carey | Reporter

Kathleen E. Carey has been a reporter for the Delaware County Daily Times since 1998.

🐦 Follow Kathleen E. Carey @dtbusiness



SPONSORED CONTENT



## Companies Are... 

By The Penny Hoarder

How many times have we fallen for this?

## Join the Conversation

We invite you to use our commenting platform to engage in insightful conversations about issues in our community. We reserve the right at all times to remove any information or materials that are unlawful, threatening, abusive, libelous, defamatory, obscene, vulgar, pornographic, profane, indecent or otherwise objectionable to us, and to disclose any information necessary to satisfy the law, regulation, or government request. We might permanently block any user who abuses these conditions.



Case 2:22-cv-00499-DSC   Document 1-1   Filed 03/28/22   Page 33 of 49

Money in Politics

# New Texas Law Means More Unwanted Children Placed with Private Companies

As The State's New Abortion Law Creates More Unwanted Babies, Another Law Funnels Them to Facilities Run by GOP Donors

**By:** Andy Hirschfeld | Oct 15, 2021

 39



Gov. Greg Abbott [R-TX], seen with former Pres. Donald Trump in Pharr, TX, on June 30, at an unfinished section of Trump's border wall. (Image: Photo by Brandon Bell / Getty Images.)

On September 1, 666 new laws went into effect in Texas. Some of them stoked significant controversy, especially the abortion law, which at its very core is devoid of an objective basic understanding of the female reproductive system. The law has been condemned by just about every relevant medical expert, even at the United Nations.

Lawyers for the Department of Justice said the state's move was "in open defiance of the Constitution."

The new set of laws has been seen as so extremist, Gov. Greg Abbott (R-TX) and his political allies have been called "The American Taliban" on social media.

The restrictive abortion law has not only been seen as a human rights violation but it also has an impact on the state's economy. Companies including Salesforce are rethinking their relationships with the state.

Unless the DOJ succeeds in getting the law struck down, more unwanted babies will be born in Texas, likely stressing the state's foster care system, which has already deteriorated under Abbott's watch. And the fate of Texas's foster care system is also going to be affected by another of Abbott's new laws, one that has received far less attention so far.

This new law bars the state from having foster children spend the night in settings that aren't otherwise considered residential. These settings include Child Protective Services' offices, motels, and churches. And the state had been resorting to that more frequently. According to the Texas Tribune, in one month alone this year, 415 Texas children spent at least two consecutive nights in unlicensed facilities.

On its own, the new law banning this has been touted as a positive move, but the state has not provided much of an alternative. The state has fewer beds than it used to, losing roughly 1000 beds in group homes.

Increasingly, the state was already turning more to the private sector. With the new law limiting alternative options, the state is paying to place more kids in residential treatment centers run by private companies, some of which are big GOP donors. One of them is GEO Group, the private prison operator.

According to the Texas Ethics Commission, GEO Group political action committees gave to several top Texas Republicans. Since 2018, GEO Group has given $35,000 to statewide GOP groups and also in 2018 the group notably gave $10,000 to the state's attorney general, Ken Paxton. The company gave upwards of $50,000 to Abbott ahead of the 2014 election through the Texans For Abbott PAC. According to Public Citizen, GEO Group's PAC gave more to Texans For Abbott than to any other elected official with the exception of House Minority Leader Rep. Kevin McCarthy (R-CA) and former Pres. Donald Trump.

One of GEO Group's centers is run by a subsidiary, Abraxas Youth and Family Services. One Abraxas facility, the Hector Garza Center, has been shuttered, although the state's database still lists it as active.

According to court-ordered monitors in a recent federal court case, 81 percent of the children at the Hector Garza Center said they were put in painful physical restraints. Monitors also reported that children there were sleeping outside of bedrooms.

But closing such centers isn't necessarily a remedy. According to the suit, several troubled facilities closed, changed names, and then reopened. It's a common tactic among residential treatment centers in Texas and across the country.

On top of that, the state failed to follow through on its own closure recommendations. It recommended the closure of five facilities, but only three actually closed.

In Texas, there is also an overlap between the major players in foster care and in immigrant detention centers. And they have deep ties to top Texas Republicans at the federal level, where immigration policy is made. GEO Group in particular operates several facilities in South Texas. They saw a surge in use during the Trump Administration's acceleration of the family separation policy.

According to Federal Election Commission filings, GEO Group's PAC donated $5000 to Sen. John Cornyn (R-TX) and $7500 to Rep. Dan Crenshaw (R-TX) in 2019. The group also gave $10,000 to Sen. Ted Cruz (R-TX) in 2018.

GEO Group operates several facilities that are contracted by Immigration and Customs Enforcement. Many have notable histories of abuse. The Karnes County Residential Center in particular faced allegations of sexual abuse over the years.

Accusations of abuse are not limited to GEO Group facilities; many other programs across the state have history of child abuse.

According to reporting from the Texas Observer, in 2019 there were more than 2000 reports of abuse, neglect, and exploitation in residential treatment centers, where 12 percent of the state's children in foster care end up.

In November 2020, a worker at the Youth and Family Enrichment Center in Tyler, Texas, was convicted for having sex with an underage boy who ran away from the program.

In a federal lawsuit, court monitors found that between July 2019 and April 2021, 23 children died in state custody. Six of the deaths were tied to abuse or neglect.

The Texas foster care system also outsources kids to the same kinds of facilities out of state. One of them is Lakeside Academy in Kalamazoo, Michigan. The facility was recently shuttered after a high profile case in which 16-year-old Cornelius Frederick was restrained by several program workers after throwing a sandwich. His death was ruled a homicide. Lakeside was one of three programs contracted by the state of Texas.

Federally contracted residential treatment centers involved with the family separation policy were as far away as Pennsylvania. Residents there faced similar issues.

One facility of note is called KidsPeace in Bethlehem, Pennsylvania.

That center had 18 incidents of reported physical maltreatment, 11 incidents of verbal maltreatment, and seven incidents of staff sexual assault on children, according to Children's Rights and the Education Law Center of Pennsylvania.

As a whole, KidsPeace owns and operates facilities in multiple states and has a rampant, well-documented history of abuse. Their facility in Minnesota was shut down following several troubling allegations, including placing children as young as 12 into 'fight clubs'

The Justice Department in a court filing Monday resumed its legal battle to kill the Texas abortion law. The filing includes the stories of Texas women whose financial circumstances and child-care needs make it difficult for them to seek abortions out of state, raising the prospect Texas will soon have more foster children on its hands and in the hands of private, for-profit companies.

Abbott's office did not respond to TYT's request for comment.

*Andy Hirschfeld is a freelance reporter. You can find him on Twitter @andyreports*

TYTNETWORK   © Copyright 2022 The Young Turks, Inc. All Rights Reserved.

## Program Facility Background: Hector Garza Residential Treatment Center

Monitors' Visit to Hector Garza Residential Treatment Center ID# 959366

### Description of Facility and Night Time Supervision:

### Facility Description:

Hector Garza Residential Treatment Center ("Hector Garza") is located at 620 E Afton Oaks Blvd in San Antonio, TX. Hector Garza is a four-story building that is licensed to serve up to 139 male and female residents between the ages of ten to seventeen. Hector Garza is licensed to serve children with an emotional disturbance and also to provide transitional living services.

### Overall Minimum Standards Compliance

The Monitors reviewed Hector Garza's standards compliance history from May 1, 2018 to May 1, 2020, revealing that the State evaluated 1,312 standards for compliance. HHSC-RCCL issued fifty-nine citations and provided 120 instances of Technical Assistance (TA). Some of the more concerning citations and TA included:

- Twenty-six citations for inappropriate restraints of children and fifty-three instances of related TA;
- Five citations for inappropriate discipline of children and twenty-five instances of related TA; and
- Twelve citations for neglectful supervision of children and twenty-five instances of related TA.

### RTB for Abuse or Neglect

Over the last five years, Hector Garza has had four RTBs for abuse or neglect:

- One involving a staff who had "consensual sex"[1] with a resident while the resident was on a home pass.
- One involving neglectful supervision in which a child attempted suicide in a hygiene closet.
- One involving a child who swallowed batteries and had to be admitted to the hospital due to a lack of staff supervision.
- One involving neglectful supervision in which a child committed suicide by hanging herself.

---

[1] Children in custody do not have the capacity to consent to sex with a staff person. The Monitors are quoting the State's investigative findings, but dispute its appropriateness.

**Corrective Action**

RCCL placed Hector Garza on probation in June of 2016 due to citations issued in investigations dating back to 2014. However, the probation was overturned on administrative review and the facility was instead placed under evaluation. The evaluation period lasted for approximately six months, from August 25, 2016 through February 17, 2017. The conditions the facility was required to meet during the evaluation were focused on ensuring appropriate staff supervision of youth.

**Restraints**

Hector Garza consistently reports to the State a high incidence of restraining children. Child restraints have increased at Hector Garza over the past three years:

- **2017**: 2,189 restraints reported
- **2018**: 2,211 restraints reported
- **2019:** 2,624 restraints reported

The facility had the second highest restraint rate of licensed placements in 2017 and 2018, and the third highest restraint rate in 2019.

**Monitoring Visit Description**

<u>Awake-Night Walk Through</u>

The monitoring team conducted a five-day on-site visit to Hector Garza in December 2019. The monitoring team , which on the first night consisted of Monitor Ms. Fowler and three monitoring team members, arrived for the unannounced nighttime awake-night visit at 11:45 p.m. and rang a bell located by the front door, to which there was no response. The monitoring team made multiple attempts to call the number posted at the door for night-time access, to no avail. After waiting at the front door for approximately fifteen minutes, two Hector Garza staff members, escorting a female youth, exited the elevator into the lobby area. One of the staff members came to the door and granted the monitoring team access. The staff person who opened the door introduced himself as a night-shift supervisor and immediately indicated Hector Garcia was short-staffed for the night and had "some things going on" causing them to be short staffed. Hector Garza staff escorted the monitoring team to the elevator where they split into two groups.

Team A went to the 2nd floor Courage wing and observed two staff members sitting at a folding table centrally located positioned in the hallway where youth bedrooms are located. Staff reported that the wing was at capacity with thirty female youth present.

Staff were completing paperwork on each child, including what staff called "skin checks" (bedroom checks for youth) and behavior issues, which were documented on the night-time log and shared with the staff on the next shift. Team A observed four female children sleeping in the hallway on

mattresses. Two of the children were sleeping on bare mattresses on the floor. Staff said that so because they were on close supervision due to safety issues. It was difficult to walk through the hallway because of the mattresses.

One member of Team A toured the unit with a Hector Garza staff member while the other monitoring team member interviewed the other staff member present. While touring, the staff member explained "skin checks" are completed every 10-15 minutes by shining a flashlight on the children. Staff also utilize an electronic system called Guard 1 to capture each time they enter a bedroom to conduct checks by tapping a wand on a button located on the bathroom door.[2] There were two to three beds in each room. One bedroom had a pile of drywall on the floor; it appeared the wall may have been kicked and the dry wall was torn off the wall.

Team B went to the third floor and were left by the escorting supervisor after he unlocked the door for entry into the Honors Unit. Upon entry to the Honors wing Team B noticed two staff seated in the hallway outside of the youths' bedrooms: one staff at the front end (close to the office) and the second staff at a small table approximately midway down the hall. Staff explained checks are conducted at least every 15 minutes and documented in the night-time log. They also use Guard 1. The unit appeared to be cluttered, dirty and had a lot of trash on the floors. There were twenty-seven boys on the unit, many of whom were awake.

One awake child explained that he had cut his finger on a piece of metal in his room for which he received medical treatment. Another child, who was standing in a doorway directly in front of the second staff seated midway down the hall, complained that staff had threatened to restrain him, provoking him to misbehave. Team B also observed a youth sleeping on a mattress on the floor in the activity room at the far end of the hallway, and two children in one of the dark rooms seated close to one another talking.

Two other youth who were awake and on mattresses in the hallway said the reason they were in the hallway was that their room (302) was "shut down" because it had holes in the walls. Staff said the reason they were in the hallway was because they were on close supervision. Team B found the door to room 302, which was locked. Team B asked Hector Garza staff to open the door. When



the door was unlocked, Team B observed three bed frames in the room. One metal bed frame had been significantly bent so it sagged in the middle, along with multiple large holes in the walls. Staff explained the room was vacant and the door



---

[2] Although staff are using Guard 1, the administrator later informed the Monitors that no one knew how to access the information collected by the system because the person with this knowledge was no longer employed at the facility.

would be locked until repairs could be made.

The supervisor returned and escorted Team B to the Valor unit. Upon entering Valor unit, there were two staff members present, one near the office and one about halfway down the hall seated at a small table. There were twenty-one youth on the unit and only one youth appeared to be awake. The staff demonstrated knowledge of the room check policy and explained that room checks are conducted and documented in the nighttime logbook at least every fifteen minutes. They also indicated that they use Guard-1.

Team B was preparing to interview the staff on the Valor unit when they heard a disruption on the Honor unit, across the hallway. Team B could not fully view the activity, but heard a youth yell that he could not breathe. Shortly afterward, two youth ran out of the Honor unit and jumped over the control room counter into the foyer in an attempt to leave the floor via the elevator. Staff from the Valor unit left the unit to assist, leaving Team B alone on the Valor unit with twenty-one youth for approximately twenty minutes. Through a window in the locked door, Team B was able to partially view staff in the foyer tackling one youth to keep him in the area while the other child was being restrained. From Team B's vantage point, it appeared three staff members forced the youth being restrained into a seated position on the floor with his legs in front of him. One staff member was laying on the youth's legs. Another staff was directly behind the youth, holding him at the biceps and pulling his arms directly back. A third staff member was behind the second staff holding the youth at the forearm/wrist pulling the youth's arms directly back and up as far as they could force them.

As the Honors unit quieted, another disruption erupted on the unit. Staff pulled another youth from the Honors unit through the office area and placed him inside the door of the Valor unit, where Team B was still waiting. Hector Garza staff left again. The youth was calm and told the monitoring team, "this happens all the time" and the unit was "worse than prison." He said the other youth were trying to "jump" (attack) him. The staff escorted him to the gym in order to keep him safe.

Once the Honors unit quieted, staff showed Team B the night-time log book for the unit. The log book had no checks documented from 12:15 a.m. to 12:57 a.m. The following morning when the monitoring team requested a copy of the night-time log book, the forty-five minute gap did not exist.

Meanwhile, Team A left the second floor for the fourth floor to observe the Dream and Inspire units. Team A interviewed one of the staff present in each unit; the interviews and walk-through were much the same as on the second floor. Staff indicated that twenty-four children were currently housed on the unit. Five youth were in the hallway on mattresses on the floor and one child was awake.

As Team A was completing the last staff interview on the fourth floor, the facility staff received a call on the walkie talkie requesting support on the third floor. Initially, staff on the Inspire unit did

Case 2:22-cv-00499-DSC Document 1-1 Filed 03/28/22 Page 41 of 49

not respond. The caller requested back up again, and the Inspire staff responded they were not permitted to leave their assigned unit. A third call requested help, and an Inspire staff finally indicated she had to assist, leaving the Dream unit short-staffed. Team A then proceeded to the third floor to rejoin the team members who had been left on Valor during the disruption.

When Team A exited the elevators onto the third floor, the Hector Garza staff directed them to remain in the foyer. In the foyer, the monitoring team observed a mat on the floor, where a male child was sitting, and two staff members. The youth was upset. He explained that he had been restrained. He stated, "They did me dirty. Watch the video and see his knee in my back." Team B exited the Valor unit, and the supervisor escorted the full monitoring team to the first floor. While in transit, the supervisor informed the monitoring team that a riot had occurred on Saturday night that required staff to call the police to assist. The monitoring team departed the facility at 1:15 a.m.

Daytime Tour

The following day, the monitoring team, joined by Monitor Mr. Ryan, completed a daytime tour, during which they observed a flurry of activity to clean and repair the damage the monitoring team saw during the night-time visit. The Monitors met Hector Garza's compliance officer and other administrative staff.

The first floor of Hector Garza accommodates administrative offices for the program administrator, program director, assistant director, clinical director, accountant, therapist, on-duty nurse, and internal investigator. It also includes the kitchen and cafeteria, an educational space, a gymnasium, and the staff training room. Hector Garza has an outdoor recreation area, but because Hector Garza is a locked facility, the outdoor recreational area is in an internal courtyard.

The three upper levels of the single building house residents; the second floor has one wing for housing youth, while the third and fourth floors each have two wings for housing youth. The secured office area or control room divides the two wings on the third and fourth floors. Youth housing areas include:

- Courage. Located on the second floor with capacity for thirty female youth. The second floor also accommodates an area designed for a school, but is not currently in use.
- Honor and Valor. Located on the third floor, Valor has capacity for twenty-four male youth, and Honor has capacity for thirty male youth.
- Dream and Inspire. Located on the fourth floor. Dream has a capacity for thirty females; Inspire has capacity for twenty-five females.

Each wing contains several bedrooms which sleep up to three youth. The bedrooms are small and sparsely furnished. The beds appeared dilapidated and consisted of an institutional mattress, a pillow, a sheet, and a blanket. Each bedroom is equipped with a bathroom, which were locked. The staff members are required to unlock the bathroom for the youth. The walls in the bedrooms are

scarred with areas where paint and walls had been heavily scratched. The interior window panes are scratched. Each wing includes at least one activity room, but the furnishings and equipment in the activity rooms were limited.

Hector Garza hosts an on-site school located on the first floor of the facility. Educational services are provided by John H. Wood Jr Inspire Academy, a charter school, which uses the JHW-Braination District Residential Learning Model, a primarily computer-based curriculum.

Hector Garza staff work in staggered eight-hour shifts: 7:00 a.m. to 3 p.m.; 3:00 p.m. to 11:00 p.m.; and 11:00 p.m. to 7:00 a.m.

File Reviews and Interviews

Over the four day visit, the monitoring team reviewed:

- Forty-nine PMC child files; and
- Thirty employee files.

And conducted, on site:

- Five awake-night staff interviews;
- Twenty-three PMC child interviews;
- Fifteen staff interviews, inclusive of the night time staff;
- One treatment director interview; and
- One administrator interview.

Overall, youth repeatedly emphasized how much they did not like living at Hector Garza. Of the operations that the monitoring team visited in advance of this report, this sets Hector Garza apart from the others. When asked if they liked living at Hector Garza, not a single child reported liking it, when that was presented as an option. Thirteen of the children interviewed (59%) emphatically answered that they did not like it, and nine children reported that it was "okay." This is the only facility that the monitoring team visited, as of May 2020, where no children reported they liked living there.

As the monitoring team continued the interviews, the reasons became clearer: Forty-three percent (10) of the interviewed children indicated they did not feel physically safe on campus, and ninety-five percent (22) of the children interviewed reported physical fights between children on campus. One hundred percent indicated that there were physical fights between children in their housing units. Six children reported having been hit by a staff person, and nineteen children reported having been hit by another child. Eighty-one percent of the youth interviewed had been restrained, and many of the youth complained the restraints were painful.

Case 2:22-cv-00499-DSC Document 1-1 Filed 03/28/22 Page 43 of 49

The Monitors observed an environment that was much more like a punitive, juvenile-justice facility atmosphere than a treatment-oriented atmosphere. Ninety-five percent of the children interviewed reported having been physically searched, and all children interviewed reported having their rooms searched while they were on campus. Children's rooms had two lines drawn in front of their doors, one inside the room and one just inside the doorway. The child had to ask staff permission before crossing these lines when they were supposed to be in their rooms. If they crossed a line without asking or being granted permission, youth said they were punished.

During one interview with the Monitors, a child became agitated and upset about conditions at Hector Garza, and the Monitors asked the treatment director (whose office was next door) if she could come in to help comfort the child. The treatment director responded that the child's therapist was not on campus that day, and refused to come into the room. After this exchange, one of the Monitors resorted to going out to the hallway to try to find a staff person at Hector Garza who knew the child to comfort her.

The file reviews and interviews revealed the following patterns or trends:

1) Children tattooing: The Monitors noticed fresh-looking tattoos on two youth; when asked about the tattoos the youth informed they had received them while at Hector Garza.

2) Bullying and Gang recruitment: Youth informed the monitoring team about gang and recruitment activity and instances in which youth take food from others (called "bowskie").

3) Failure to report Abuse and Neglect to SWI:
   a) Grievance forms: Youth informed they write grievances about abuse and neglect allegations, but the facility often takes eight to ten days before they begin to review the grievance.
   b) Inappropriate touching: When children report inappropriate touching or child-on-child sexual activity to staff, the monitors learned the allegations are at times addressed with room changes and not reported to SWI.
   c) Phone access: Youth reported, and staff confirmed, youth are not able to make calls to SWI or the Ombudsman without a staff member present listening to the call.
   d) Review of incident report and documentation: The monitoring team's review revealed that Hector Garza's QA staff review and investigate allegations of abuse and neglect and determine whether an incident should be reported to SWI, versus requiring staff who observe or receive the allegation to call the incident to SWI directly.

4) Lack of Confidence in SWI: Youth reported a lack of confidence in reporting allegations of abuse and neglect because when the State investigates, according to numerous youth, "nothing changes, nothing is done," and "there is no point in calling the Hotline for that reason."

5) Inability to Contact Caseworker: Youth reported that the only time they are permitted to contact their CVS caseworker is during their once per week meeting with their therapist.

6) "Dirty" Restraints: Many youth interviewed reported "dirty" restraints are common and frequent. Youth reported that staff often move them into a room to conduct a restraint where there is no camera. Numerous youth described restraints with "[their] arms pulled straight behind their backs and then lifted." The youth described restraints that were painful, and several reported being injured during restraints. When the monitoring team reviewed with Hector Garza's assistant administrator the video of the restraint, which had occurred during the monitoring team's awake-night walk through, the assistant administrator agreed the restraint was not appropriate. The monitoring team's review of Hector Garza incident reports involving restraints and medical documentation revealed children's complaints involving shoulder pain or other injuries.

7) Lack of Triggered Reviews: Minimum standards require a triggered review when a child is restrained four times within seven days. File reviews evidenced a number of restraints, but the monitoring team found no triggered reviews. The Monitors reported this to DFPS after the visit. Hector Garza was later cited for the failure to conduct triggered reviews.

8) Staff Neglect: Youth reported frequent fights between residents, and complained that often, staff do not intervene. One female youth reported that a staff member told her, "If you lived in an apartment together, then there would be no one to intervene."

9) Staff-to-Child Ratio: Staff interviews revealed a practice of holding night staff until day staff ratios are met. Night staff interviews revealed there are typically two staff on each hallway and one nighttime supervisor on each floor, but during the monitoring team's visit, there were only two instead of the required three night supervisors on duty. The program appears to struggle with adequate staffing, according to staff who were interviewed. Understaffing results in staff working double shifts. Even when they are sick, staff reported they are expected to work.

10) Food Complaints: The youth reported, and the staff confirmed, poor food quality.

11) Education: Youth who were not yet enrolled in school were observed cleaning the floors on one of the units. The practice of holding night staff until day staff ratios are met and requiring the lights to remain off until day staff arrive causes the youth to be late to school.

**Complaints Called in to SWI By Monitors and Outcomes**

The Monitors reported eight incidents to SWI, two that the monitoring team witnessed during the site visit, and the rest based on interviews with children during the monitoring visit. Six of the reports to SWI involved restraints (including the one that monitoring team witnessed during the awake-night walk through). Three of these involved injuries to children, and two were reported after youth showed the monitoring team scars that they alleged were the result of injuries caused by restraints.

Of the two SWI referrals made by the monitoring team based on what they witnessed during their night-time walk-through, one related to the restraint they witnessed, which appeared painful and did not appear to be in keeping with appropriate protocol. The second related to youth being left alone on the Valor unit without a staff person present while staff managed the disruption across the hallway. Two citations were issued by RCCL after these referrals were investigated, one for improper restraint and another for failing to meet the proper child-to-staff ratios on the Valor unit during the disruption across the hall.

<u>Alleged Perpetrator Trends</u>

The Monitors reviewed the histories of four staff members named as alleged perpetrators in the eight cases the monitoring team called into SWI. A review of the histories of the four staff members revealed thirty-two previous reports[3] where they were identified as alleged perpetrators. Of those thirty-two reports, three resulted in a citation to the facility for standards violations. For example:

- Staff 1 (reported to SWI by the Monitors for inappropriate restraint): This was the eleventh allegation over four-and-a-half years, which included five for inappropriate restraint resulting in two citations for standard violations;

- Staff 2: has six allegations in the past year and a half including five for inappropriate restraint, resulting in one citation for a standards violation;

- Staff 3: has six allegations in just over a year, and none of these have resulted in a citation.

- Staff 4: has seven allegations in the past nine months, including five for inappropriate restraint and two for inappropriate discipline, with one resulting in a citation for a standards violation related to inappropriate restraint.

**Failure to Conduct Triggered Reviews**

After returning from the on-site visit, the monitoring team realized that information requested related to "triggered reviews," requested during the site visit for PMC children who had been restrained, was not provided by Hector Garza. A triggered review is a process through which a child's treatment providers and service planning team review the circumstances surrounding use of physical restraints on a child, and develop a plan for reducing the need for these interventions.[4] Triggered reviews are required by HHSC regulations if the same child is personally restrained four times within a seven-day period, more than twelve times within a

---

[3] Multiple perpetrators can be named in one report.
[4] 26 Tex. Admin. Code §748.2907.

thirty-day period, or if the child is restrained more often than the written order or service planning team recommendation allows.[5]

On December 16, 2019, the Monitors e-mailed Hector Garza's program administrator and asked that the information it be sent via e-mail.[6] The administrator responded, and said that under Hector Garza's process, "when a review is triggered it is either addressed through a document we call [a] 'Behavior Contract' or in the following Comprehensive Treatment Plan if it falls within 30 days."[7] The Monitors received what Hector Garza staff asserted were triggered review documents on January 6, 2020 as attachments to an e-mail.[8]

A review of the documents showed that Hector Garza was not engaging in a triggered review process for youth who should have had one. The Monitors e-mailed the State to alert them to the issue, stating:

> We were disappointed to see that [Hector Garza] did not find any documentation of triggered reviews for the youth that, according to [the RTC's] own list of restraints, should have received one. In [the RTC's] response, they note several youth who should have received a triggered review, but for whom they have no documentation. For others, they point to a Behavior Contract or Close Supervision Contract, or to the youth's regular treatment or service plan.
>
> The use of a Behavior Contract or a Close Supervision Behavior Contract as documentation of a triggered review is clearly inappropriate, at least as those documents are used at Hector Garza. And the service or treatment plan is only appropriate…if it meets the requirements for a triggered review in 748.2907….The rule clearly anticipates an individualized assessment. It also sets out a framework in which the <u>overuse of EBI is understood to be a failure of the treatment model, not the child's failure.</u>
>
> And yet, even in cases in which the child's treatment or service plan was revisited within the timeline required for a triggered review, they did not include this information in the treatment or service plan. None of the documents they provided for the youth for whom they could point to something as documentation of a "triggered review"…were individualized and included the information or the level of detail anticipated by 748.2907.
>
> Perhaps even more concerning, where they point to the Behavior Contract as the documentation of a triggered review, instead of treating overuse of personal restraints as a treatment failure, the Contract holds the youth responsible. These contracts set out a series of consequences or a loss of privileges flowing from a youth's behavior, and require to youth to comply with the terms of the contract to regain those privileges. The

---

[5] 26 Tex. Admin. Code §748.2901.
[6] E-mail from Deborah Fowler, Court Monitor to Sergio Fernandez, Facility Director, Hector Garza Center (December 16, 2019 1:59 PM CST) (on file with Monitors) (Triggered Reviews).
[7] E-mail from Sergio Fernandez, Facility Director, Hector Garza Center to Deborah Fowler (December 19, 2019 3:48 PM CST). (on file with Monitors) (Triggered Reviews).
[8] E-mail from Sergio Fernandez, Sergio Fernandez, Facility Director, Hector Garza Center to Deborah Fowler (January 6, 2020 5:29 PM CST) (on file with Monitors) (Triggered Reviews).

contracts include boilerplate language that says, "If [the youth] becomes a danger to [her]self or others, or engages in severe property damage or AWOL attempts, Safe Crisis Management techniques may be used. **[The youth] will do everything in [her] power to refrain from any involvement in physical interventions."** To the extent that this is a "behavior contract" the implication is that if the youth does not "refrain from" involvement in restraints, they will be punished with an extension of the contract (and thereby an extension of the loss of privileges). This flips the regulatory requirement on its head, placing the burden for reducing physical restraints on the child, not the treatment providers who should be creating "a written plan for reducing the need for emergency behavior intervention."

In essence, what is clear form their attempt to provide documentation of triggered reviews is that <u>these reviews are not taking place at Hector Garza</u>. And in fact, what they are doing is at odds with the regulatory framework for EBI and triggered reviews.[9]

(Emphasis in original). The Monitors uploaded the documentation provided by Hector Garza to the State's SharePoint file. As a result of the Monitors' notification to the State, the issue was reported to SWI. After an investigation, Hector Garza was cited for failing to conduct triggered reviews.

## February 21, 2020 Court Order

In addition to the reports to SWI, the Monitors spoke with DFPS leadership and counsel aware of their serious concerns for child safety at Hector Garza on December 10, 2019. On January 3, 2020, DFPS notified the Monitors:

> We have been working since the date of our December 10th call regarding the Hector Garza Center. Among the efforts we have undertaken, high level DFPS and HHSC staff, including DFPS Commission Masters, personally visited the facility. We will provide a more in-depth update on our work early next week.[10]

The Monitors responded that day:

> [W]e are particularly concerned about the risk of harm to children at Hector Garza based on our visit last month and as further evidenced by the CLASS report of the serious injury sustained by a child on Christmas day.
>
> Would you advise us whether DFPS & HHSC have implemented heightened contract & licensing monitoring of Hector Garza pursuant to Remedial Order 20 and, if so, when, and what specifically that has involved to date?

---

[9] E-mail from Deborah Fowler, Court Monitor, to Andrew Stephens, Ass't Att'y Gen., et al (January 8, 2020 2:12 p.m. CST) (on file with the Monitors).
[10] Email from Audrey Carmical, General Counsel, Texas Department of Family and Protective Services to Deborah Fowler, Court Monitor (January 3, 2020, 1:24 p.m. EST) (on file with the Monitors).

In addition, have you suspended placements at Hector Garza and if so, effective when? If not, please advise why you have not.[11]

Later that day, DFPS responded that the State had initiated heightened monitoring of Hector Garza on December 10, 2019, and wrote that "[d]ue to an abundance of caution because of the recent number intakes at Hector Garza, DFPS put a temporary suspension in place today."[12]

On January 27, 2020, the Monitors met directly with the DFPS Commissioner and counsel, and then later that day with leadership and counsel from DFPS, HHSC and the Attorney General's Office, and repeated the Monitors' substantial concerns for child safety at Hector Garza. During the latter meeting, DFPS said it had lifted the suspension on child placements and continued to monitor the facility closely.

The Monitors briefed the Court. After a telephonic hearing with the parties on February 21, 2020, the Court ordered the State to provide information to the Monitors explaining "why the Hector Garza facility is still open and accepting foster children in light of the concerning child safety information the Monitors shared with the State following their inspection."[13]
On February 26, 2020, the State provided the Monitors with an explanation that emphasized the following points:

- **Ruled Out Findings in Abuse & Neglect Investigations**: While DFPS acknowledged forty-seven calls to SWI related to abuse or neglect since December 5, 2019 and having opened "approximately 30" abuse and neglect investigations since December 25, 2019, DFPS noted that of the four investigations that had closed, all had been Ruled Out.

- **DFPS Safety Checks**: DFPS conducted daily safety checks between January 26, 2020 and February 4, 2020, and interviewed 95 youth during these safety checks. According to DFPS, 73% of the youth interviewed reported feeling safe.

- **Quality Improvement Plan**: DFPS Contracts staff asked Hector Garza to submit a Quality Improvement Plan (QIP), which had not yet been finalized by the time DFPS submitted its report to the Monitors. However, DFPS reported that a "restraint reduction plan" would be part of the QIP.[14]

In summary, DFPS reported:

---

[11] Email from Deborah Fowler, Court Monitor to Audrey Carmical, General Counsel, Department of Family and Protective Services (January 3, 2020, 3:39 p.m. EST) (on file with the Monitors)(Hector Garza).
[12] Email from Tiffany Roper, Deputy Associate Commissioner, Department of Family and Protective Services (January 3, 2020, 9:37 p.m. EST) (Hector Garza Boles Update, Request for Discussion).
[13] M.D. v. Abbott, February 21 Order.
[14] DFPS, Hector Garza write-up, attached in Appendix ____.

Hector Garza is allowed to remain open and accept placements because (1) RCCI investigations revealed no child abuse or neglect; (2) daily safety checks revealed minimal safety and communication concerns and Hector Garza's willingness to address any negative responses; (3) Hector Garza introduced an acceptable Restraint Reduction Plan with observable results; (4) Hector Garza's willingness to continue improving, including working through a DFPS-ordered Quality Improvement Plan; and (5) RCCL investigations over a two-year period resulted in one RTB and 35 deficiencies that have all been addressed through Hector Garza's willingness to make needed changes.[15]

**May 20, 2020 E-Mail from DFPS**

On May 20, 2020, as the Monitors were completing work for this report to the Court, the Monitors received an e-mail from DFPS indicating that Hector Garza would be "phasing out their service to children in DFPS conservatorship."[16]

In response to this e-mail, the Monitors asked whether DFPS took some action that led to this decision. DFPS responded:

> Contracts and CPS were actively monitoring the Quality Improvement Plan of Hector Garza. After a deliberate and months-long monitoring process, the agency determined that while improvements were being made, their particular model was not the direction DFPS was going long-term. After mutual discussions, both parties agreed to develop a plan to transition children and to end our contractual relationship with one another.[17]

The Monitors asked RCCL whether they intended to take any action with regarding to Hector Garza's license, and RCCL responded:

> With Hector Garza, RCCL is constantly evaluating the situation there. Although there is no corrective action currently planned, RCCL will reevaluate their history for such if we receive a new RTB from DFPS.[18]

---

[15] *Id.* at 2.
[16] E-mail from Rand Harris, Chief of Staff Department of Family & Protective Service to Deborah Fowler & Kevin Ryan (May 20, 2020. 3:44 pm CST) (on file with the Monitors) (Children's Hope and Hector Garza).
[17] E-mail from Rand Harris, Chief of Staff Department of Family & Protective Service to Deborah Fowler & Kevin Ryan (May 22, 2020, 11:49p.m. CST) (on file with the Monitors)(Children's Hope and Hector Garza).
[18] E-mail from Corey Kintzer, Associate Director Legal Services Division to Deborah Fowler & Kevin Ryan (May 22, 2020, 1:45p.m. CST) (on file with the Monitors)(Children's Hope and Hector).